UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B.M., a minor child by and through R.M., | Civil No. 08cv412-L(JMA) |
| Plaintiff, | **ORDER AFFIRMING DECISION and DIRECTING ENTRY OF JUDGMENT** |
| v. | |
| ENCINITAS UNION SCHOOL DISTRICT, | |
| Defendant. | |

**I.   Background[1]**

This is an appeal from an Office of Administrative Hearings ("OAH") decision under the Individuals with Disabilities Education act, 20 U.S.C. § 1400, *et. seq.*

The Encinitas Union School District ("District") initially assessed B.M. ("plaintiff" or "Student") in June 2006, and found he was eligible for special education and related services because of autistic-like behaviors. Plaintiff's parents then sought independent educational evaluations ("IEE") at public expense because they disagreed with the District's assessment.

---

[1] The facts are taken from the administrative record. The Court also notes that this appeal has been pending a particularly long time based in part on a significant record that did not include a table of contents and the lack of a motion initiating review of the appeal. "Though not a 'true motion for summary judgment, the appeal of an IDEA-based due process hearing decision is properly styled and presented by the parties in a summary judgment format.'" *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). Nevertheless, the Court recognizes and appreciates the patience of the parties associated with this case.

IEEs were conducted and were paid for by the District in the areas of speech and language, occupational therapy ("OT"), neuropsychological and behavior. On September 22, 2006, plaintiff's parents filed a due process hearing request because they disagreed with the District's initial individual education plan ("IEP"). The parties agreed to mediate their disagreements. Based on the mediation, the District agreed to continue the in-home applied behavior analysis ("ABA") services plaintiff was receiving from a nonpublic agency before he became eligible for special education and related services from the District. The Settlement Agreement between the parents and District also required the District to conduct a comprehensive transdisciplinary reevaluation ("TRR") assessment of plaintiff by April 2007, and to convene an IEP in May 2007.

The District conducted the required assessment and issued the TRR which addressed the areas of psychoeducational, speech and language, occupational therapy ("OT"), and adaptive physical education ("APE"). Plaintiff's parents disagreed with the TRR and requested additional IEEs at public expense. The District filed a request for a due process hearing in June 2007 to defend the appropriateness of its TRR.

On May 30, 2007, plaintiff's annual IEP meeting took place in which the parents actively participated. Thirty-five goals and objectives were developed. After the May 30, 2007 IEP meeting, the District convened additional meetings on June 14, and June 21, 2007. Because the parents continued to disagree with aspects of the IEP, the District agreed to conduct additional assessments for visual processing and auditory processing. The additional assessment did not occur because the parents did not consent to them.

The IEP developed for the 2007-2008 school year offered plaintiff placement in a preschool special day class (SDC) located at Flora Vista. The SDC is a regional preschool class program for severely handicapped 3-4 year old students with significant delays and includes children with autism. Additionally, the District offered a 31 hour-per-week program that included two-and-a-half hours of speech therapy a week, one and one-half hours of OT, eight hours per week of school-based ABA, six hours per week of in-home ABA, and one-on-one adult support throughout the school day. Plaintiff's parents did not consent to the May 2007 IEP

contending the District's offer of placement and services represented a dramatic decrease from the services agreed to in the January 2007 Settlement Agreement that resolved the prior dispute and was insufficient to meet the unique needs of the Student, specifically his apraxia of speech. As previously noted, the District was unable to assess plaintiff's visual processing and the implementation of the IEP because the parents would not consent.

In August 2007, the District requested a due process hearing to determine the appropriateness of the District's IEP offer for the 2007-2008 school year. Plaintiff's parents then removed plaintiff from the District's program and indicated that they would obtain private related services and would seek reimbursement from the District. Nevertheless, the District continued providing plaintiff with 20 hours of in-home ABA therapy. During that same time, the parents obtained additional assessments from the same assessors who had conducted IEEs in 2006: Abby Rozenberg, Dr. Mitchel Perlman, Dr. Susan Daniel, Susanne Smith Roley, and Dr. Denise Eckman.

The two due process hearing requests were consolidated with the administrative hearing held on November 26-30, and December 3-5, 2007. On January 30, 2008, the ALJ entered her decision which found that the District had prevailed on all issues, determined the District's TRR was appropriate, and its IEP program offer for the 2007-2008 school year provided plaintiff with a FAPE. Plaintiff now appeals the consolidated decision.

**II.     Standard of Review**

"When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and 'bas[es] its decision on the preponderance of the evidence.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. § 1415(i)(2)(B)). Based on this standard, "complete de novo review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007). The party challenging an administrative decision in district court bears the burden of proof that the decision should be reversed. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1398 (9th Cir. 1994) superceded by statute on other grounds; *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007).

The statutory requirement "that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Rather, "due weight" must be given to the findings in the administrative proceedings. *Id.*

As a threshold matter, deference should generally be given to the state hearing officer's findings when they are "thorough and careful." *K.D. ex rel. C.L. v. Department of Educ., Hawaii*, 665 F.3d 1110, 1117 (9th Cir. 2011). Here, the ALJ's decision was thorough and careful, and intensive and comprehensive. On the basis of the eight-day hearing, the parties' submission of a large number of exhibits, and the testimony from numerous educators and professionals affiliated with plaintiff and the District, the ALJ provided a thirty-five page, single-spaced decision. The decision provided a extensive and full discussion of the application of the facts of this matter to the relevant legal contentions made by the parties. The ALJ thoughtfully articulated the basis of her opinions, the inferences she drew from the testimony and the documentary record, and her rationale for affording greater weight to certain evidence and testimony. Accordingly, the ALJ's decision will be given substantial deference.

**III.    IDEA**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1300 (1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)). The IDEA ensures that "all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Under the IDEA, a FAPE is special education and services that "(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the school standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this

title." 20 U.S.C. § 1401(9). To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an individualized education program ("IEP"), and determine an appropriate educational placement of the student. 20 U.S.C. § 1414. More than a "simple funding statute," the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States, and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." *Honig*, 484 U.S. at 310.

The Supreme Court held in *Board of Education v. Rowley*, 458 U.S. 176, 200-01 (1982), that the IDEA does not require school districts to provide special education students with the best education available, or to provide instruction that maximizes the student's abilities. *See also Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1314 (1987). Instead, school districts are required only to provide a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefits to the student, and the choice of methodology in providing special education and related services is the prerogative of the school district. *Id.; see also C.P. v. Prescott Unified School District*, 631 F.3d 1117, 1122 (9th Cir. 2011) (holding that IDEA allows educators the discretion to select from various methods in order to meet the individualized needs of a student if those practices are reasonably calculated to provide educational benefit). But "Congress did not intend that a school system could discharge its duty under the IDEA by providing a program that produces some minimal academic advancement, no matter how trivial." *Amanda J. ex rel. Annette J. v. Clark County School Dist.*, 267 F.3d 877, 890 (9th Cir. 2011).

Under *Rowley*, the applicable federal and state statutes, and case law, the standard for determining if a school district's provision of services substantively and procedurally provides a FAPE involves consideration of four factors: (1) are the services designed to meet the student's unique needs; (2) are the services reasonably designed to provide some educational benefit; (3) do the services conform to the IEP as written; and (4) is the program offered designed to provide the student with the foregoing in the least restrictive environment. *Capistrano Unified School*

*Dist. v. Wartenberg By and Through Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995)(citing *Rowley*, 458 U.S. at 188–89); *see also Katherine G. v. Kentfield School District*, 261 F. Supp.2d 1159, 1171–72 and n.12 (N.D. Cal. 2003).

A student's FAPE must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." *Rowley*, 458 U.S. at 181 (citing 20 U.S.C. § 1401(18)). The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. 20 U.S.C. § 1401(19); 20 U.S.C. § 1414(d); 34 C.F.R. § 300.20. Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. 20 U.S.C. §§ 1414(a)(5), 1413(a)(11). In addition, "[p]arental involvement is a central feature of the IDEA." *Hoeft*, 967 F.3d at 1300. "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free appropriate education' for each disabled child." *Id.* Although the IDEA guarantees parents the opportunity to participate meaningfully, as one participant in a group, the parents' opinions may be overridden. *See Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131 (9th Cir. 2003) (recognizing that, although a school district must develop an IEP with "meaningful parental participation," a school district "has no obligation to grant [a parent] a veto over any individual IEP provision"), *superseded by statute on other grounds*, 20 U.S.C. § 1414(d).

**IV.  Discussion**

Plaintiff argues that the decision was arbitrary and capricious because the ALJ: (1) applied the *Rowley* standard of "some benefit" rather than the applicable higher "meaningful

benefit" standard; (2) discounted all of the testimony of the student's witnesses without legal justification; (3) applied an erroneous legal standard concerning the least restrictive environment (LRE); and (4) was not impartial. Plaintiff points to the elimination of vision services in the IEP without an assessment, the reduction of speech and language assistance, the use of nonstandard testing with respect to the TRR, and the lack of a written plan for actual implementation for plaintiff's transition to a school site.

### A. Some Benefit Standard

As noted above, the Supreme Court held in *Rowley* that school districts are not required to provide special education students with the best education available, or to provide instruction that maximizes the student's abilities. *Rowley*, 458 U.S. at 200-01. But plaintiff argues that the *Rowley* standard is inappropriately applied to the IDEA, and this case in particular, because *Rowley* interpreted the IDEA's predecessor statute, the EAHCA. (Opening Brief at 3.) As a result, plaintiff contends that "[w]hether a child obtained a 'meaningful benefit' rather than merely 'some' benefit is the appropriate standard in this case." (*Id.*) The "meaningful benefit" language is found in *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)(To provide a FAPE, an IEP must meet the student's needs and be reasonably calculated to provide the student with a "meaningful" benefit.).

But the Ninth Circuit Court of Appeals has held, after *Adams,* that *Rowley* has not been superseded. *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 951 (9th Cir. 2010). "The proper standard to determine whether a disabled child has received a free appropriate public education is the 'educational benefit' standard set forth by the Supreme Court in *Rowley*. *Id.* The *J.L.* court further explained:

> Some confusion exists in this circuit regarding whether the Individuals with Disabilities Education Act requires school districts to provide disabled students with "educational benefit," "some educational benefit" or a "meaningful" educational benefit. [citation omitted]. As we read the Supreme Court's decision in *Rowley*, all three phrases refer to the same standard. School districts must, to "make access meaningful," confer at least "some educational benefit" on disabled students.

*Id.,* n. 10.

Plaintiff's argument that *Rowley* is inapplicable in the present case and a new, higher

standard based on "meaningful educational benefit" is incorrect. Instead, in order to offer a FAPE, defendant was required to provide a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefits to plaintiff, and the choice of methodology in providing special education and related services is the prerogative of the school district. The ALJ properly applied the appropriate legal standard for the education of children with disabilities under the IDEA throughout her decision.

### B.     Discounting of Student's Witnesses

Plaintiff contends that the ALJ systematically discounted the testimony of all of the Student's expert witnesses as "irrelevant" by interpreting the "snapshot rule" too narrowly. (Plaintiff's Opening Brief at 7-8.)

The Ninth Circuit uses a "snapshot" rule in evaluating IEPs:

> Actions of the school systems cannot be judged exclusively in hindsight.... [A]n individualized education program is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted."

*Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)(citing *Fuhrman v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3d Cir. 1993). (Opening Brief at 4.) In the present case, the relevant "snapshot" was of plaintiff's abilities in May 2007, the time of the IEP.

Here, the ALJ used the term "irrelevant" to describe the newly presented assessments and testimony of plaintiff's experts, made a few months after the IEP was developed. While acknowledging that the Ninth Circuit follows the "snapshot rule," plaintiff contends that the assessments and testimony provided by plaintiff's experts after the IEP was drafted nevertheless should have been taken into account to find that the IEP was not appropriate for Student. Plaintiff states, with no reference to legal authority, that "Adams does not instruct courts to simply disregard the testimony of qualified experts if they did not happen to provide input during the IEP meeting." (Opening Brief at 9.)

It is worth noting that the plaintiff's experts, who were acknowledged to be well-qualified to offer their opinions and conducted assessments prior to the May 2007 IEP team meeting, were the same experts who evaluated plaintiff after the IEP offer and testified at the hearing.

Plaintiff's experts provided the results of their initial evaluations to the IEP team prior to the May IEP meeting although they did not attend the IEP meeting. Thus, plaintiff's experts had input into the development of the May 2007 IEP based on their earlier assessments of plaintiff. Based on the "snapshot" rule, it was not error for the ALJ, to find the post- IEP assessments and testimony of plaintiff's experts to be irrelevant in determining whether the IEP offer of services and placement for plaintiff at Flora Vista SDC was appropriate.

### C. Least Restrictive Environment

A special education student must be educated in the "least restrictive environment" ("LRE") available to meet a student's unique needs, and should be mainstreamed with non-disabled peers to the maximum extent possible. *See* 20 U.S.C. § 1412(a)(5)(A).

20 U.S.C. § 1412(a)(5)(A) requires:

> To the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

"The language of the IDEA ... clearly indicates a strong preference for 'mainstreaming,' *i.e.,* educating handicapped children alongside non-handicapped children in a regular educational environment." *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995) (citing *Rowley*, 458 U.S. 176, 188–89). "In carrying out this directive, the state educational agency must develop and implement an IEP aimed at providing each disabled child with a [FAPE] in the least restrictive environment." *Id.; see also Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996) ("Disabled children, to the maximum extent appropriate, should be educated with children who are not disabled, *i.e.*, they should be mainstreamed. 20 U.S.C. § 1412(a)(5)(B) ...").

What constitutes an LRE is necessarily an individualized, fact-specific inquiry. In each case, the apparent tension between the IDEA's clear preference for mainstreaming and its requirements that schools provide individualized programs tailored to the specific needs of each disabled child must be balanced. 20 U.S.C. §§ 1401, 1414(a)(5); *see also, J.W. v. Fresno Uni. Sch. Dist.*, 626 F.3d 431, 448 (9th Cir. 2010).

In considering whether the District proposed an appropriate placement for Student, the Court balances four factors: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect Student had on the teacher and children in the regular class; and (4) the costs of mainstreaming Student." *Sacramento City Uni. Sch. Dist., Bd. of Educ. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994). "This analysis directly addresses the issue of the appropriate placement for a child with disabilities under the requirements of 20 U.S.C. § 1412(5)(B)." *Id.*

Here, plaintiff contends that although the ALJ set forth the appropriate legal standard (AR Vol. XII, 1079), she relied on the District's witness, Dr. Erin Ring to "dictate" an incorrect standard, *i,e.*, a "natural environment". (*See* Opening Brief at 5-6.) As a result, plaintiff asserts that the ALJ committed legal error and her decision was arbitrary and capricious. *Id.*

Plaintiff's reading of the ALJ's discussion of LRE is premised on a single paragraph which notes that:

> Dr. Ring testified that under the LRE mandate, children have to be educated in a natural environment with typical peers unless the severity of a child's disability precludes it. Dr. Ring's opinion is that Student belonged in a setting that allowed him to play with typical peers from whom he would derive great educational benefit, and that placing Student exclusively in an in-home ABA [Applied Behavior Analysis] program would be too restrictive.

(AR Vol. XII, at 1080)

This single paragraph does not adopt Dr. Ring's description of a "natural environment" as the appropriate legal standard but merely sets out Dr. Ring's opinion concerning the LRE for plaintiff. As such, it does not support plaintiff's contention that the ALJ applied an improper legal standard.

Plaintiff also argues that the evidence consistently demonstrated that plaintiff was severely distractable and had a short attention span and therefore, a special education classroom placement with numerous distractions, *i.e.,* toys, other children, was an inappropriate placement. Accordingly, Student needed a one-on-one teaching experience in a quiet environment without distraction. Because of his distractability, plaintiff's parents sought a total in-home ABA program.

The May 2007 IEP, intended for the 2007-08 school year, offered B.M. placement in its preschool SDC at Flora Vista which also included a 31-hour per week program, speech therapy, OT, pull out ABA, one-on-one adult support throughout the school day, and six hours of in-home ABA per week.

Without substituting the Court's thoughts on the matter, "[e]ven if the services requested by parents would better serve the student's needs than the services offered in an IEP, this does not mean that the services offered are inappropriate, as long as the IEP is reasonably calculated to provide the student with educational benefits." *See D.H. v. Poway Unified Sch. Dist.*, 2011 WL 883003 at *5 (S.D. Cal. Mar. 14, 2011) (affirming conclusion of ALJ that deaf student was not entitled to CART under IDEA). If the IEP confers "some educational benefit" upon plaintiff, it will satisfy the IDEA. *Mercer Island Sch. Dist.*, 592 F.3d at 947; *K.S. v. Fremont Unified Sch. Dist.*, 426 Fed. Appx. 536, 537–38 (9th Cir. 2011) (applying "some educational benefit" standard).

Plaintiff acknowledges that all of Student's experts had assessed Student in 2006, and the 2006 assessments had been provided to the District prior to the May 30, 2007 IEP meeting. Thus, plaintiff's argument that the ALJ rejected all of plaintiff's experts' assessments is flawed. Although as discussed above, the post-IEP assessments and testimony of plaintiff's experts were not relevant to the inquiry concerning whether the IEP offered Student a FAPE; however, the experts' prior assessments were available for consideration by the District in developing the IEP and the ALJ at the hearing.

The ALJ reviewed and remarked upon the following information concerning Student's placement at Flora Vista SPC. Patty Tran, a District Speech and Language Pathologist participated in the May 30, 2007 IEP and conducted B.M.'s speech and language assessments between March and April 2007. Ms. Tran testified that based on progress made since his June 2006 assessment and after receiving speech and language therapy services, plaintiff demonstrated readiness to attend preschool with typically developing peers. The ALJ also stated that Ms. Tran "credibly testified that the recommendation was based on her observation that Student had an inability to attend for more than 30 minutes at a time and could be distracted."

Abbey Rozenberg, a licensed speech and language pathologist, offered testimony for Student. She conducted a clinical assessment at plaintiff's parent's request on October 28, 2006 and again on August 3, 2007 – after the May 30, 2007 IEP team meeting. Even though Ms. Rozenberg did not consult with the District or observe plaintiff receiving services at Flora Vista, she noted that "given Student's strong non verbal skills and an interest in social experiences, that a preschool setting with typical peers, who may serve as appropriate language models will allow for generalization of speech and language skills." Ms. Rozenberg also agreed that plaintiff had strong pre-readiness skills warranting placement in a preschool setting.

The District's school psychologist, Melissa Dawson, was familiar with plaintiff and knew of his disability. Prior to the May 30, 2007 IEP, Ms. Dawson administered the Behavior Assessment System for Children II (BASC-2 Parent and Teacher Rating Scales), a standardized rating scale designed to look at a child's behavior, and the Psychoeducational Profile-Third Edition ("PEP-3") that is intended to assess a student's developmental functioning. She noted that the BASC II scale indicated plaintiff was easily distracted and had difficulty sustaining his attention to adult directed tasks. Ms. Dawson testified before the ALJ that she consulted with the assessment team members, considered prior IEEs, and plaintiff's parents' input. And as a member of the May 30, 2007 IEP team, she recommended B.M.'s placement at Flora Vista preschool SDC.

Dr. Denise Eckman offered expert testimony on behalf of plaintiff and his autism. She did not provide services to plaintiff. In November 2006, she conducted a behavioral assessment of plaintiff and also observed plaintiff at Flora Vista for approximately 30 minutes. Her report was available to the IEP team prior to the IEP meeting. At the due process hearing, Dr. Eckman testified that the IEP offer of placement in the SDC program was inadequate and recommended a 40-hour, intensive one-to-one in-home ABA program with formal behavioral intervention.

In September 2007, a few months after the May 30, 2007 IEP, Dr. Eckman conducted a second assessment of Student. The ALJ concluded that Dr. Eckman's post-IEP opinion concerning the District's offer of placement was not relevant under the snapshot rule, *i.e.*, it was based on an assessment conducted months after the IEP.

Plaintiff's parents also offered the testimony of Dr. Mitchell Perlman. He reviewed the results of a 2006 assessment, and without treating plaintiff, consulting with District staff, or observing the proposed placement at Flora Vista SDC, he concluded that plaintiff was not ready for preschool placement. He concurred with Dr. Eckman's recommendation of an in-home ABA program. In assessing plaintiff again in September 2007, he observed the proposed placement at Flora Vista and again recommended the in-home, one-to-one ABA provided to plaintiff by a private provider. The ALJ found Dr. Perlman's September 2007 opinion irrelevant because it was offered after the development of the IEP.

Erin Chin, a licensed occupational therapist, conducted the OT assessment of plaintiff and participated in the preparation of the TRR for the District. In reviewing the Sensory Profile assessment that obtained input from plaintiff's parents, she noted that plaintiff was easily distracted and had difficulty attending to tasks. Nevertheless, she opined that plaintiff would benefit from a small classroom environment with minimal distractions and minimal visual stimulation.

Plaintiff's OT expert, Susanne Rolley, testified that plaintiff was easily distracted, had difficulty regulating his attention and activity level, desired engagement with adults and peers, but found social interactions difficult. She did not offer an opinion concerning plaintiff's placement at Flora Vista SDC. After the May 30, 2007 IEP, Ms. Rolley conducted a second assessment on July 6, 2007 but she did not offer an opinion on the placement of plaintiff at Flora Vista SDC. Again, the ALJ noted that Ms. Rolley's 2007 assessment was not relevant.

The ALJ heard the testimony of plaintiff's experts at the hearing and correctly relied on assessments and information available to the IEP team. After considering all the relevant evidence, the ALJ concluded that the testimony of District personnel, who had daily or regularly scheduled time with plaintiff, was more persuasive than that of plaintiff's witnesses, whose opinions were largely based on file reviews. The ALJ supplied a careful and reasoned basis for her determination that the IEP offering plaintiff placement at Flora Vista SDC provided plaintiff with a FAPE.

/ / /

///

### D. Failure to Assess in the Area of Vision and Reduction in Speech and Language Services

In his opening brief, plaintiff asserts that Student was receiving vision therapy prior to the May 30, 2007 IEP meeting. This therapy was an agreed upon service in the Settlement Agreement. Dr. Susan Daniel, a Doctor of Optometry, conducted a visual processing evaluation of Student on November 6, 2006, at the parents' request. Dr. Daniel recommended individualized optometric vision therapy for Student. The April 2007 TRR addressed auditory and visual processing. The District did not offer continuing vision services in the IEP. At the IEP meeting, plaintiff's parents raised the issue of vision therapy.

The District offered the annual vision and hearing tests to all students. Plaintiff's parents notified the District that Student was receiving vision therapy from an independent source and the parents declined to consent to the District's vision assessment offer. The ALJ noted that the District had addressed the areas of plaintiff's suspected disability under the Settlement Agreement but even if the District failed to assess all areas of suspected disability, plaintiff was not deprived of a FAPE for a procedural violation.

At the hearing, the District's speech pathologist, Ms. Tran, recognized that Student suffered from apraxia based on Ms. Rozenberg's October 2006 assessment. Ms. Rozenberg testified that peer reviewed research showed that treatment of apraxia requires individual therapy of three to five hours per week. Ms. Rozenberg recommended five hours of individual speech therapy for Student. The IEP offered five half-hour sessions per week.

Plaintiff contends that because the District was aware of the peer reviewed research indicating three to five hours was optimal for progress and the District offered only two and a half hours, the reduction in speech therapy failed to confer a "meaningful educational benefit" on Student as required under *Adams*.[2] (Opening Brief at 20.) But the ALJ carefully discussed that while the IEP services and aids should be based on peer-reviewed research to the *extent*

---

[2] As discussed above, the *Rowley* standard of "some benefit" is properly applied.

*practicable,* a District may provide a program or service where it is impracticable to provide such a program. (Decision at 30 (emphasis in original).) The ALJ properly noted that "Courts have determined that the most important issue is whether the proposed instructional method meets the student's needs and whether the student may make adequate educational progress." (Decision at 31.)

The ALJ also noted that Ms. Rozenberg's August 2007 assessment – although not relevant to the IEP development – indicated that "given Student's strong non-verbal skills and an interest in social experiences, that a preschool setting with typical peers, who may serve as appropriate language models will allow for generalization of speech and language skills." (Decision at 9.) Ms. Tran's ongoing observational assessments of Student and hours providing him with speech and language therapy supported a basis for finding that Student had deficits in the form of apraxia and further speech and language therapy.

Given the hearing officer's careful articulation of the facts and law, her finding that the reduction of language services by half an hour per week did not deny Student a FAPE because the District properly identified apraxia as a suspected area of disability and assessed Student's need in an appropriate manner.

**E.     Transition Plan**

Plaintiff contends that the ALJ erred by overlooking the absence of a transition plan for Student in the District's IEP.

An IEP is a "formal, written offer [that] creates a clear record that will do much to eliminate troublesome factual disputes." *JL*, 592 F.3d at 953 (9th Cir. 2010) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994)). In an IEP, a school district must specify "the anticipated frequency, location, and duration of [special education] services." 20 U.S.C. § 1414(d)(1)(A)(vi) (1998). "The amount of time to be committed to each of the various services to be provided must be (1) appropriate to the specific service, and (2) stated in a manner that is clear to all who are involved." 64 Fed. Reg. 12,479. "[A] state must comply both procedurally and substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citing *Rowley*, 458 U.S. at 206-07).

Although the IEP should offer some guidance if a transition is anticipated, "not every procedural violation results in the denial of a free appropriate public education." *Mercer Island*, 592 F.3d at 953. "A procedural violation denies a free appropriate public education if it results in the loss of an educational opportunity, seriously infringes the parents' opportunity to participate in the IEP formulation process or causes a deprivation of educational benefits." *N.B. v. Hellgate Elementary School Dist., ex rel. Bd. of Directors, Missoula County, Mont.,* 541 F.3d 1202, 1208 (9th Cir. 2008)(quoting *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)(Technical deviations, for example, will not render an IEP invalid.).

Here, the details for plaintiff's transition from a largely in-home program to a public school special education classroom were not specified in the IEP. However, the Record supports that plaintiff had been attending Flora Vista for some services and was familiar with the campus and staff. For example, during the hearing, Melissa Dawson, a school psychologist with the District, testified that starting in January of 2007, after the Settlement Agreement, plaintiff came to Flora Vista for some services. As a result, plaintiff was familiar with the location of the campus and the staff who would provide him services. (Vol. III, 115-117.)

Further, the Record demonstrates that the District staff, along with plaintiff's parents, had discussed and considered what would be of value in transitioning plaintiff to the campus. A more specific and detailed transition plan could be added to the IEP without violating the requirement of a formal, written offer. *See, e.g., G.D. ex rel. Dien Do v. Torrance Unified School Dist.*, 2012 WL 751014 *(C.D. Cal. 2012)(citing *Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir.2009) ("And more importantly, if services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information. This scenario is the exact opposite of what Congress intended when it provided for regular review and revision of IEPs, ..., and it would do little to help the interest of disabled children.").

Plaintiff has not shown that the student was in any manner prejudiced by the failure to specify the exact transition plan for his attendance at Flora Vista or that he was denied an educational benefit or that the student's parents were not involved in the discussion concerning

the transition to on-campus services.

Accordingly, even if the lack of a written transition plan for student was a procedural violation, in this case, the ALJ correctly concluded that Student was not denied a FAPE.

**Conclusion**

For all the foregoing reasons, the Court affirms the ALJ's decision in this matter as careful, reasoned, and supported by the preponderance of the evidence. As noted above, the IDEA does not require that a district "maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." *Rowley*, 458 U.S. at 200. Here, the District offered "a basic floor of opportunity, [that is,] access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. The April 2007 TRR was appropriate in that the District conducted an extensive reevaluation of Student by using a variety of assessment tools, with the assessors trained and well-qualified to administer tests and make observations. The TRR, by including psychoeducational, speech and language, occupational therapy and adaptive physical education evaluations, assessed Student in all areas of suspected disability. The IEP contained an adequate statement of B.M.'s levels of academic achievement and functional performance, articulated measurable goals, and was reasonably calculated to provide an educational benefit in the least restrictive environment which is what is required under the IDEA. *See J.W. ex re. K.K.W. v. Governing Bd. of East Whittier City School Dist.*, 473 Fed. Appx. 531, 533 (9th Cir. 2012).

Based on the foregoing, **IT IS ORDERED** affirming the decision of the hearing officer and directing entry of judgment in defendant's favor.

**IT IS SO ORDERED.**

DATED: February 14, 2013

M. James Lorenz
United States District Court Judge

COPY TO:

HON. JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

1  ALL PARTIES COUNSEL